IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CIVIL ACTION NO. 07-30029-01 |
| VERSUS | * | JUDGE JAMES |
| BRUCE WILLIAMS | * | MAGISTRATE JUDGE HAYES |

## REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, is a Motion to Suppress (Doc. #24) filed by the defendant, Bruce Williams. Williams contends that the police violated his Fourth Amendment rights by entering his house to arrest him, by "securing" the house after the arrest, and then by searching the house after obtaining his consent. This court has conducted two evidentiary hearings, one on December 19, 2007, and the other on January 31, 2008. At those hearings, the government established that the police had a valid warrant to arrest Williams and that Williams signed a waiver of search warrant form after his arrest. In light of these findings, combined with the protective sweep doctrine set forth in *Maryland v. Buie*, 494 U.S. 325 (1990), it is recommended that the motion to suppress be **DENIED**.

I

Two days before Williams' arrest, officers of the Monroe Police Department arrested another individual in possession of crack cocaine. (Tr-1, p.3).[1] The individual had previously served as a confidential informant, providing accurate information to officers in the department.

---

[1] The transcript from the evidentiary hearing on December 19, 2007 will be cited as "Tr-1" in this document.

*Id.* Officer Baugh, who testified at both evidentiary hearings, learned from the individual that he had purchased the cocaine from Williams at 1305 Georgia Street in Monroe. *Id.* at 3-4. The individual also told Baugh that Williams drove a Nissan pickup truck. *Id.* at 4. Baugh then spoke with another officer in the department. *Id.* at 3. That officer indicated that he suspected that Williams and several other individuals cooked, packaged, and sold cocaine from the house on Georgia Street. (Tr-2, p.5).[2]

Between August 6, 2007, and August 8, 2007, the date of the arrest, Baugh drove past the residence a few times. (Tr-1, p.4). During several of the drive-bys, Baugh saw a Nissan pickup truck, matching the confidential informant's description of Williams's vehicle, parked at the house. *Id.* Baugh learned that Williams had previously filed a damage to property complaint on the pickup truck. *Id.* During one of the drive-bys, Baugh saw a Lincoln Town Car parked at the residence. *Id.* The Lincoln was registered to an individual who had a criminal history involving the distribution of narcotics. *Id.* at 4-5.

On the date of the arrest, Baugh conducted additional surveillance of the residence. Around 6:45 p.m., Baugh saw Williams' pickup truck and a Dodge Magnum parked at the house. *Id.* Shortly thereafter, two people left the house, got into the Dodge Magnum and drove away. *Id.* at 5. After the driver failed to use a turn signal, another officer conducted a traffic stop and discovered a large amount of cocaine in the car. *Id.* at 5-6. After learning of the discovery, Baugh and Officer Kent decided to contact the defendant. *Id.* at 6. The officers knew that Williams had an outstanding traffic warrant. *Id.* at 6.

---

[2] The transcript from the evidentiary hearing on January 31, 2008 will be cited as "Tr-2" in this document.

The officers, wearing shirts indicating they worked for the Monroe Police Department, knocked on the front door of the house. *Id.* at 6-7. Williams, whom Baugh immediately recognized from a photograph, opened the door. *Id.* The officers identified themselves and told Williams that they were conducting a narcotics investigation. *Id.* at 7. They asked for permission to enter the house. *Id.* at 7-8. Williams said they could enter. *Id.*

As the officers moved to enter the house, however, Williams attempted to close the door and run back inside. *Id.* at 8. The officers immediately took him to the ground in the doorway and placed him under arrest. *Id.* The majority of Williams' body was in the house at that time. (Tr-2, p.10). The officers read Williams his *Miranda* rights and he indicated that he understood his rights. (Tr-1, p.8). The officers told Williams that they were placing him under arrest for the traffic warrant and also were detaining him as part of the narcotics investigation. (Tr-2, p.9-10).

Within 30 to 60 seconds of the arrest, another officer arrived on the scene. *Id.* at p.10. At that time, Baugh and Kent "secured the interior of the house." (Tr-1, p.8). To do this, they moved quickly through the house, looking in every room. (Tr-2, p.11). Baugh testified that they also looked under the beds and in the closets to make sure no one else was in the house. *Id.* at 11. While securing the kitchen, Baugh saw a large amount of powder cocaine in a large zip-lock bag on the kitchen counter. (Tr-1, p.8). No other persons were discovered during the sweep, which took less than two minutes to conduct. *Id.*; (Tr-2, p.12).

Given the rules set forth in *Buie*, the lay-out of the house is pertinent. The house is relatively small, estimated by the parties to be between 800 and 1000 square feet. (Doc. #38, p.3). From the exterior, two or three steps lead up to the front door. (Doc. #39). The front door enters directly into the living room and the kitchen is to the right. *Id.* If one were to continue

walking straight back, one would encounter the bathroom and two bedrooms in the rear of the house. *Id.* Beginning at the front of the house and leading toward the back of the house is a wall that separates the kitchen from the area immediately inside the front door. *Id.* The wall only extends out about five feet, however, and there is no door leading into the kitchen; there is instead a large cased opening between the living room and the kitchen. *Id.*

Hence, if one were to stand in the living room, facing the kitchen, the wall would only obscure the small portion of the kitchen toward the front of the house, containing the refrigerator and sink. (Tr-2, p.20). The kitchen counter, on which the cocaine was found, would be visible. *See id.* The same counter was not visible, however, from where the officers were standing after they had placed the defendant under arrest. (Tr-1, p.19).

After the officers finished securing the house, they went out front to speak with Williams. (Tr-2, p.12-13). Williams agreed to sign a waiver of search warrant form for the house. (Tr-1, p.8). Williams is literate and a high school graduate. He told the officers he was not under the influence of drugs or alcohol. *Id.* at 9. After signing the waiver form, Williams personally led the officers around the house, showing them where to find additional cocaine,[3] $15,000 in cash, and assorted drug paraphernalia. *Id.* at 10-13. While Williams does not own the house, he had lived there alone for the three months preceding the arrest. *Id.* at 11, 17. Williams admitted that he had been dealing both crack and powder cocaine from the house. *Id.* at 11.

**II**

The defendant argues that the officers' entry into his home was illegal. In support, the defendant points out that (i) the officers did not have a search warrant; (ii) the officers did not

---

[3] In all, the officers recovered over 60 ounces of cocaine from the house.

4

have the defendant's consent to enter; (iii) the plain view exception did not justify their entry; and (iv) the officers did not have reasonable suspicion.[4]  With regard to the officers' entry, however, none of these arguments is apposite.  The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. CONST. amend. IV.  The Supreme Court has held that "[a]n arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton v. New York*, 445 U.S. 573, 603 (1980).

In this case, the officers knew of an outstanding traffic warrant for the defendant.  The defendant does not challenge the existence or validity of the warrant.  In addition, the officers had several reasons to believe the defendant was home.  First, they had identified the pickup truck parked outside as one the defendant drove.  Second, when the officers knocked on the front door, Williams opened the door.  Baugh immediately recognized Williams, having previously viewed a photograph of him.  Since the officers had an arrest warrant and reason to believe that Williams was home, they had the authority to enter into the home to arrest him.

### III

Next, the defendant contends that the officers violated the Fourth Amendment by securing the house after placing him under arrest.  "It is well settled . . . that a search conducted without a warrant issued upon probable cause is *per se* unreasonable subject to only a few specifically established and well-delineated exceptions."  *Schneckloth v. Bustamonte*, 412 U.S.

---

[4] To the extent that the defendant is arguing the officers did not have a reason to suspect that he was present in the home, the undersigned finds to the contrary.

218, 219 (1973) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).  One such exception is the protective sweep doctrine set forth in *Maryland v. Buie*, 494 U.S. 325 (1990).  Officers may seize items discovered during a protective sweep, if the officers looked only "in places where an individual might be hiding." *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005).

In *Buie*, the Court imposed two standards for protective sweeps conducted without search warrants.  For a sweep of "closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched," officers do not need probable cause or reasonable suspicion.  494 U.S. at 334.  For protective sweeps of all other "spaces where a person may be found . . . the searching officer [must] possess[] a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* at 335, 337.

Consequently, *Buie* requires this court to consider two questions.  First, is the kitchen in Williams' house a "closet [or] other space[ ] "immediately adjoining the place of arrest?" *Id.* at 334.  If not, did the officers have the requisite reasonable articulable suspicion to perform a protective sweep of the house? *Id.* at 337.  As the undersigned answers the first question in the affirmative, it is unnecessary to consider to the latter issue.

One Fifth Circuit case and several cases from outside this circuit support the holding that the kitchen, only a few feet away from the place of arrest, constituted an immediately adjoining space under *Buie*.  In *United States v. Charles*, 469 F.3d 402 (5th Cir. 2006), the court upheld the warrantless sweep of a portion of a 250 square-foot storage unit even though the officers lacked probable cause and reasonable articulable suspicion.  In *Charles*, the police suspected that the

defendant was storing drugs in the storage unit. *Id.* at 404. On the day of the arrest, the officers watched the defendant enter the storage unit and bring some envelopes out of the unit to his truck. *Id.* At that point, the officers decided to arrest the defendant. *Id.* They ordered the defendant out of the unit and onto the ground. After arresting the defendant just outside the unit, an officer "entered the unit and checked inside, under, and around" a car parked inside the unit "to ensure that there were not other occupants in the unit." *Id.* In the car, the officers found crack cocaine. *Id.* The court of appeals held that the sweep of the unit was legal since the officers swept an area immediately adjoining the place of arrest. *Id.* at 405-06.

In *United States v. Thomas*, 429 F.3d 282 (D.C. Cir. 2005), the Court of Appeals for the District of Columbia upheld a protective sweep within the defendant's home. In *Thomas*, like the case at bar, the defendant was apprehended "in the hallway immediately inside his front door." *Id.* at 287. The officers then swept the defendants' one-bedroom apartment, including his bedroom. *Id.* at 284. The bedroom door was "at the far end of the hall . . . 15 feet from the entrance to the apartment." *Id.* In the bedroom, the officers found a shotgun shell and a handgun. The court held that the protective sweep was legal even absent probable cause or reasonable articulable suspicion, reasoning that "every room swept, could be immediately accessed from the hallway." *Id.* at 286. Finding that the bedroom, 15 feet away from the doorway, constituted an immediately adjoining space, the court reasoned that the "entrance to the bedroom was a straight shot down the hallway." *Id.* at 287. In upholding the validity of the sweep, the court rejected the defendant's argument that

> his "place of arrest" was just the area "inside of the front door," not the entire hallway of which it was a part, and therefore the bedroom did not "immediately adjoin[]" the place of arrest. According to [the defendant], the immediately adjoining

spaces "included at most the living room, and the front hallway." Otherwise, in a small apartment such as this one the "police would be entitled to sweep the entire premises without a showing of reasonable suspicion." . . . [The court refused to] narrowly define the place of arrest, as Thomas suggests . . . merely in order to avoid permitting the police to sweep the entirety of a small apartment. **The safety of the officers, not the percentage of the home searched, is the relevant criterion. . . . If an apartment is small enough that all of it "immediately adjoins the place of arrest" and all of it constitutes a space or spaces "from which an attack could be immediately launched," . . . then the entire apartment is subject to a limited sweep of spaces where a person may be found**.

*Id.* at 287-88 (emphasis added).

Finally, in *United States v. Mayo*, 792 F. Supp. 768 (M.D.Ala. 1992), the court denied a motion to suppress, similarly holding that a protective sweep was legal even without probable cause or reasonable suspicion. In *Mayo*, police officers placed the defendant under arrest in the living room of his trailer. *Id.* at 769. While one officer was speaking with the defendant, another conducted a protective sweep. *Id.* "Standing in the doorway of an adjoining bedroom, [the other officer] looked in and observed two guns inside an open closet." *Id.* The court, in denying the motion to suppress, held that "[t]he bedroom doorway which adjoined the living room . . . falls within the *Buie* definition of a 'space immediately adjoining the place of arrest from which an attack could be launched.' " *Id.* at 773-74.

Each of these cases – *Charles*, *Thomas*, and *Mayo* – supports the holding that the kitchen in this case constituted an immediately adjoining space under *Buie*. In this case, the defendant was arrested in the doorway of his house, with the majority of his body inside the house. The kitchen immediately adjoins the area just inside the front door. Furthermore, a wall that extends five feet from the front of the house toward the back made it impossible for the officers to see a portion of the kitchen. In the portion of the kitchen not visible, there was adequate space from

8

which another individual could launch an attack. By taking just a few steps, Baugh or Kent could see around the corner and ensure their safety. This distance is comparable to that covered by the officers in *Charles* and *Mayo*, and significantly less than that covered by the officer in *Thomas*. As a result, the officers could look into the kitchen for other persons, even if they did not have probable cause or reasonable suspicion.

Relying on Baugh's testimony, the undersigned further finds that the cocaine was in plain view on the kitchen counter. The officers discovered the cocaine in the course of the legal protective sweep. As a result, the sweep and the seizure of the cocaine fall under exceptions to the warrant requirement and do not violate the Fourth Amendment.

**IV**

Finally, the defendant argues that he did not voluntarily consent to the search of the house. Consequently, he seeks suppression of the results of the search that followed the arrest and the protective sweep.

"It is . . . well settled that one of the specifically established exceptions to the requirements of both warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth*, 412 U.S. at 219. "[W]hen a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given." *Id.* at 222. "[T]he question whether a consent to a search was in fact 'voluntary' . . . is a question of fact to be determined from the totality of all the circumstances." *Id.* at 227. The Fifth Circuit uses a six-factor test to determine whether consent was voluntary:

(A) the voluntariness of the defendant's custodial status;

  (B) the presence of coercive police procedures;

  (C) the extent and level of the defendant's cooperation with the police;

  (D) the defendant's awareness of his right to refuse consent;

  (E) the defendant's education and intelligence; and

  (F) the defendant's belief that no incriminating evidence will be found.  *United States v. Ruigomez*, 702 F.2d 61, 65 (5th Cir. 1983) (citing *United States v. Phillips*, 664 F.2d 971, 1023-24 (5th Cir. 1981)).

### A. The Voluntariness of the Defendant's Custodial Status

The defendant was under arrest when he signed the waiver of search warrant form.  In addition, the officers had used force to place Williams under arrest.  However, a few minutes went by between the time of the arrest and the time Williams consented to the search.  During that time, the officers who had used the force left Williams in order to secure the house.  There is no indication that the earlier use of force affected Williams' decision to provide consent, or that the force used was excessive.

### B. The Presence of Coercive Police Procedures

There is no evidence in the record that the police used coercive procedures, nor does the defendant allege that the police employed any coercive procedures.  Indeed, in light of the circumstances, it is unlikely the officers would have deemed it necessary to use coercive tactics.  Baugh believed he had sufficient evidence to obtain a search warrant and intended to obtain a warrant before the defendant consented.  But for Williams' decision to consent, it seems very likely that Baugh would have obtained a search warrant.

### C. The Extent and Level of the Defendant's Cooperation with the Police

After initially attempting to evade the police, Williams was extremely cooperative. Williams signed the waiver of search warrant form and led the officers around the house. In the process, the defendant helped the officers discover additional cocaine, money, and paraphernalia including dishes and scales. Baugh testified that at least some of the evidence was located in places that would not have been otherwise evident to the officers. (Tr-1, p.10).

### D. The Defendant's Awareness of His Right to Refuse to Consent

It is evident that Williams understood that he had the right to refuse consent. In fact, Williams indicated that he understood that he could either consent or refuse and wait for the officers to obtain a search warrant. Williams chose to consent because he believed that if he refused, the officers would ultimately find everything after obtaining a search warrant. Furthermore, it seems that Williams' criminal history had provided him with prior experience and knowledge of these procedures. (Tr-1, p.12).

### E. The Defendant's Education and Intelligence

Williams told Baugh that he was literate and had graduated from high school. He also indicated that he was not under the influence of any substance that would impede his ability to make decisions. There is no indication in the record that Williams was unable to comprehend his options.

### F. The Defendant's Belief that No Incriminating Evidence will be Found

Clearly, Williams knew that incriminating evidence would be found; he helped the officers find it.

Having considered the six factors, the undersigned finds that Williams voluntarily consented to the search. Most notably, Williams was able to articulate his alternatives and to

11

explain why he decided to consent. In addition, he exhibited a high degree of cooperation by leading the officers around the house and showing them where to find the evidence. The undersigned believes these factors outweigh the fact that Williams was under arrest and knew that incriminating evidence would be found.

For the above-stated reasons, IT IS RECOMMENDED that defendant's motion to suppress (Doc. #24) be **DENIED**. Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **ten (10) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **ten (10) business days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Monroe, Louisiana, this 5th day of February, 2008.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE